Filed 6/25/15  In re F. T. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re  F. T., A Person Coming Under the Juvenile Court Law. | |
| SAN MATEO COUNTY HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>V.T. et al.,<br><br>        Defendants and Appellants. | A142565<br><br>(San Mateo County<br>Super. Ct. No. 81801) |

In this dependency appeal, V.T. (father) and K.L. (mother) seek relief from the juvenile court order terminating their parental  rights with respect to their youngest daughter, F. (born December 2008), pursuant to section 366.26 of the Welfare and Institutions Code.[1]  Although the record in this case is long and involves multiple dependency proceedings initiated with respect to F. and/or her siblings and half-siblings, both parents limit their argument on appeal to a single issue:  They claim that termination of their parental rights with respect to F. was improper under the "sibling exception" to adoption.  More particularly, they assert that the juvenile court erred in determining that the benefits of adoption in F.'s case outweighed the benefits of maintaining her sibling

_____

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

1

relationships. Application of the sibling exception to block adoption is appropriate when the juvenile court finds "a compelling reason for determining that termination would be detrimental to the child" because "[t]here would be substantial interference with a child's sibling relationship . . . ." (§ 366.26, subd. (c)(1)(B)(v).) Having reviewed this matter in some detail, we see no error in the juvenile court's refusal to apply the sibling exception to adoption in this case. We therefore affirm the juvenile court's order terminating parental rights.

## I. BACKGROUND[2]

Prior to the juvenile court intervention that formed the basis for these proceedings, F.'s family—including step-sister Serena (born February 1996) and siblings James (born January 2000), Billy (born March 2001), and C.T. (born March 2002)—had been the subject of 50 prior child welfare referrals in both San Francisco and San Mateo Counties, dating back to 2002. The vast majority of the referrals with respect to mother and father involved allegations of neglect, including: an unsanitary and hazardous home; the children being dirty and smelling bad; mother appearing depressed and overwhelmed; and father having difficulty with anger management and domestic violence. In fact, during this extended time frame, the family was almost always involved in a child welfare intervention of some kind.

Specifically, from November 2002 through March 2004—after voluntary services were unsuccessful—James, Billy, and C.T. were the subjects of juvenile dependency proceedings in San Francisco County under a plan of family maintenance. Thereafter, additional dependency petitions were filed in San Mateo County in February 2005, and James, Billy, and C.T. were again declared juvenile court dependants, this time remaining in out-of-home care until January 2006. The minors then continued under a family maintenance plan for three years until dependency was eventually dismissed in January

---

[2] Given the narrow scope of this appeal, we focus our factual summary on matters relevant to the strength and quality of Fiona's sibling relationships.

2

2009.[3]  Serena and her sister Jessica—two of mother's three daughters from another relationship[4]—resided with their father and were involved in dependency proceedings in San Francisco County starting in 2006, which ultimately led to the placement of Serena with mother in April 2009.[5]  Sole physical custody of Serena was granted to mother in May 2011 and Serena's dependency action was dismissed.  Jessica remained in a permanent plan of long-term foster care.

## A.    *Establishment of Dependency Proceedings*

Despite the dismissal of these various prior dependency actions, however, the family continued to be the subject of child welfare referrals.  In July 2011, for instance, the Department received a referral stating that Billy always came to school hungry, dirty, and smelly, with a fecal odor so overwhelming that people had to move away from him to prevent involuntary gagging.  In August 2011, a community-based service provider that had been working with the family since October 2010 indicated that, while the family had made "sporadic improvement," it consistently returned to "baseline which is inadequate in meeting the needs of the children."  Additionally, in September 2011, concerns were raised that the parents were not consistently giving Billy and James prescribed medications necessary to treat their serious mental health issues.  Specifically, Billy—who had very extreme acting out behavior—had been diagnosed with post traumatic stress disorder (PTSD) and oppositional defiant disorder.  James—who was reported to be delusional at times—had been diagnosed as bipolar.  Both boys had expressed suicidal ideation and had exhibited dangerous behavior toward their younger

---

[3] In July 2006, while the family remained under court supervision, Billy sustained third degree burns over 18 percent of his body.  The burns were accidentally inflicted by his sister, C.T., when she lit his shirt on fire while playing with a cigarette lighter.  Billy's back remains severely scarred as a result of this trauma.

[4] Wendy, the third daughter, reportedly spent most of her life in China when not residing with her father.  She has never been a juvenile court dependent.

[5] Allegations with respect to Serena's father included neglect, physical abuse, and a gambling addiction.

3

siblings, which the parents discounted.  Also in September 2011, C.T.'s school reported that C.T. had stated that she wanted to kill herself and claimed that she had cut herself.

While investigating these concerns, the Department discovered that the family home was "filthy," strewn with garbage, containing multiple safety hazards, and infested with cockroaches.  Two-year-old F. was observed on many occasions to be undressed, unsupervised, and with a heavily soiled diaper, and slept on the floor in an area of the house filled with roaches.  Finally, Serena—who also had a history of suicidal ideation and depression—was found to be spending days at a time locked in her room without changing her clothes and had not been to school for several weeks.  She stated that she preferred to lie in bed all day.  Serena had been psychiatrically hospitalized in 2010 for suicidal ideation while in mother's care.  V.T. reported that the minor played with fire.

On October 4, 2011, the San Mateo County Human Services Agency (Department) filed juvenile dependency petitions with respect to all five of the minors currently residing with mother and father—Serena, James, Billy, C.T., and F.—alleging that that the children were once again at substantial risk of harm due to the overarching neglect of their parents.  After a contested hearing, the minors were detained on October 7, 2011.  Specifically, F. and C.T. were detained together in shelter care, Serena was placed at Excell Readiness Center, and the boys were detained at the Receiving Home. In addition, the juvenile court referred C.T. for crisis counseling and ordered the Department to assist the court in obtaining mental health evaluations for the children.

Two days after his October 7 detention, James was placed on a psychiatric hold pursuant to section 5150 as a danger to himself.[6]  This was the eleven-year old's second 5150 hold.  Previously, he had been psychiatrically detained in 2010 after running out of

_____

[6] Section 5150 provides, in relevant part, that "[w]hen a person, as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer . . . or professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment in a facility designated by the county for evaluation and treatment and approved by the State Department of Health Care Services."

4

his therapist's office into the street and then trying to grab a police officer's gun. The previous day he had stated that he wanted to die. During this first hospitalization, James was described as having both auditory and visual hallucinations, and he remained fixated on death and dying. Despite only slight improvement, he was released at the insistence of father against medical advice. During his second hospitalization, a hospital social worker reported that James had a " 'massive preoccupation with playing videogames, and preoccupation with death and dying and killing and stabbing and knives and guns.' " He was returned to the Receiving Home on October 20 after a change in psychotropic medication seemed to be helping him.

C.T., at nine years of age, had a diagnosis of major depression with elements of psychosis. She continued to engage in the unsafe, acting-out behaviors at school that she had begun exhibiting in the weeks prior to her detention, including running out of the classroom, running off campus, hiding in the school, climbing on furniture, screaming for extended periods of time, and cursing at staff and peers. She was suspended from school on October 14, 2011, for unsafe behavior. Further, while being transported to a visit on October 13, 2011, C.T. screamed, took off her seatbelt, and hit F. and Billy. C.T.'s school principal indicated that C.T.'s behaviors were the same thing that he had seen with Billy and James all over again.

According to C.T.'s foster mother, C.T. and F. had been doing "fairly well" in the foster home. However, the foster mother stated that she had to monitor C.T. closely, particularly during her interactions with F. She elaborated: " '[C.T.] screams at F. all the time, but she doesn't scream at me. I've seen her pulling the baby across the room and hollering at her, so I have to go real fast to stop her.' " In addition, the foster mother described some concerning behavior in two-year-old F., stating: " 'There's lots of anger in her. If she can't have her way, she will hit, kick, and bang her head. She has some serious melt downs. . . . She gets up on tables, and flips over furniture.' "

In an October 2011 interim report, the Department stressed the serious mental health issues seen in all five children. As the social worker opined: "Clearly, these are very disturbed children, who are showing classic signs of not having their needs met." At

the interim hearing on October 24, the juvenile court declined to return F. to her parents' care. It again ordered mental health evaluations for all five minors. On November 16, 2011, an amended dependency petition was filed for F. adding a subdivision (j) allegation of sibling abuse to the existing subdivision (b) neglect allegation.

In its jurisdictional reports, the Department elaborated on the minors' mental health issues, attaching completed mental health assessments for all five of the children. With respect to C.T., a school-based psychiatric social worker that had worked with the family for years reported: "I haven't done a comprehensive assessment of [C.T.], but it seems like her behavior is a result of years of neglect and not getting her needs met. She likely has attachment issues. I think that's the problem with all the kids—I think they have mental illnesses because of their upbringing. . . . [C.T.] has a negative way of handling things." Another crisis counselor assigned to C.T. in October 2011 noted her attachment to her parents and the jealousy that she has "toward her siblings, specifically F." C.T. was referred to a psychiatrist for a medication evaluation, to whom she reported episodes of hearing voices. The psychiatrist recommended an antidepressant and indicated that an antipsychotic might eventually be necessary as well.

Moreover, between November 28, 2011, and January 6, 2012, the police had to be called on four separate occasions—once to school, one at the foster home, and twice during family visitations—due to unsafe behaviors exhibited by C.T. At one family visit, for example, C.T. kicked and pushed chairs and tables, rolled on the ground crying and screaming, and urinated on herself. On January 13, 2012, the juvenile court gave the Department the discretion to limit C.T.'s family visitation based on her behavior.

F.'s therapist highlighted the minor's language delays, limited ability to self-soothe, and an episode of dissociation, all signs of neglect. She also noted " 'signs of attachment issues.' " F. was also displaying some depressive symptoms and continued to struggle to meet her own needs, not understanding that adults could assist her. In January 2012, the juvenile court granted the Department the authority to have F. placed under general anesthesia so that decay in 12 of the minor's teeth could be assessed because the minor was otherwise unable to tolerate the investigation. At the dental procedure on

6

February 22, F. was found to have a total of 14 severe cavities and received crowns on 13 teeth.

Dr. Leslie Packer (Dr. Packer)—who performed individual psychological evaluations on Serena, Billy, James, and C.T.—concluded with respect to Serena that the minor "has severe social delays, she does not know how to relate to peers, and her lifelong series of crises and traumas have detracted from her ability to learn socialization skills." Dr. Packer believed a group home placement would be best for Serena. With respect to James, Dr. Packer asserted that "[i]t is clear from his speech patterns that the line of distinction between James's sense of reality and his fantasy life is not well defined." His dissociation was viewed as a defense mechanism used to cope with the home life he experienced with his parents. Similarly, Billy was assessed as using avoidance and denial to deal with his home situation. He admitted hearing voices to Dr. Packer and also stated he thinks about death a lot—" 'when I'm dead nothing more will happen to me.' " Serena was placed in a group home in December 2011, and the boys were placed together in a different group home in February 2012.

According to Dr. Packer, C.T. suffered from "extreme emotional neediness" and also used dissociation to an "unhealthy extent" as a means to escape from her current reality. She diagnosed all four of the older minors as suffering from PTSD. In addition, Billy, James, and C.T. were all receiving special education services because they had been designated " 'emotionally disturbed' " under their Individualized Education Programs (IEPs).

After numerous continuances, jurisdiction was finally established with respect to all five minors after a contested hearing on March 7, 2012. Specifically, F. was found to be a child described by subdivisions (b) and (j) of section 300. On March 27, 2012, a contested dispositional hearing was completed, the minors were declared to be dependent children of the juvenile court, and all five children were formally placed in out-of-home care. Reunification services were ordered for the family.

**B.** *Reunification Period*

In April 2012—while reunification services were being provided—C.T. and F. were moved to a different foster placement after their current foster mother indicated that "the girls had a high level of needed attention and emotions devoted to them" and that she was unable to manage their needs along with the needs of her own daughter. Serena was also moved to a higher level group home during this timeframe after engaging in disruptive behavior and refusing to go to school. After Serena attempted to heat rocks on the stove and throw them at staff and also repeatedly attempted to tie things around her neck, she was psychiatrically hospitalized pursuant to section 5150 one month into this new placement. James continued to have instances of suicidal ideation, self-harming behaviors, and physical aggression in his group home. He and Billy began sibling therapy to address their continuing "significant difficulties in regard to poor interpersonal boundaries, problematic power dynamics, and inflexible family roles." On June 14, 2012, at an interim review hearing, the juvenile court ordered twice monthly sibling visits for the minors in addition to the family visits.

In July 2012, F. underwent a psychological evaluation with Dr. Packer. According to Dr. Packer—despite the poor foundation provided in her first two years of life—F. appeared to have traits of resilience and emotional strength. The types of symptoms that F. had shown when she came into placement were no longer evident, and the foster mother reported that F.'s sibling conflicts with C.T. were "more attributable to [C.T.'s] competitiveness and jealousy, rather than F.'s behaviors per se." Moreover, F. showed no grossly evident symptoms of attachment disorder and appeared to have feelings of trust and security toward her current foster mother, whom she called " 'mommy.' " In Dr. Packer's opinion, if F. were freed for adoption, it was "realistic" that she would be able to form healthy attachments with adoptive parents. However, if more services were ordered for the parents, F. could potentially grow too old to form a secure attachment with new parent figures. Finally, Dr. Packer diagnosed F. with neglect, indicating that her speech delays were not due to any underlying disability.

On September 8, 2012, C.T. received a seven-day notice requesting a change in placement due to behaviors such as yelling, kicking, punching her foster parents, and

punching herself. According to the foster mother, C.T. frequently lied, failed to follow the house rules, engaged in self-harming behavior (such as hitting her head against the wall or burning her skin by rubbing the carpet), and had frequent tantrums (including crying, tearing her belongings out of drawers, and shouting profanities). In July 2012, she was taken to a mental health crisis center when she became upset and began to bite herself. The foster mother further stated that C.T. was jealous of F. and tended to act immaturely when adults paid attention to the younger minor. In her opinion, C.T. would thrive in a house where she was the only child. Nevertheless, on September 13, 2012, both girls were moved together to a third foster home. Because of this change in placement, individual therapy that had been scheduled to begin for F. was delayed because a new provider had to be found who could serve the minor in her new location.

The six-month review hearing was contested and continued several times from September 25, 2012, to November 15, 2012. Because of the many continuances that had occurred in this case, the hearing was also treated as a 12-month permanency hearing. At that time—despite the fact that F. had been under the age of three at the time or her removal, had been in out-of-home care for longer than the 12-month maximum prescribed by section 361.5, subdivision (a)(1)(B), and was deemed adoptable— reunification services were continued for the parents by stipulation of the parties. Specifically, pursuant to this stipulation, the parties agreed that there was a substantial probability that all of the minors would be returned to the physical custody of the parents within 18 months of detention (April 2013). The stipulation further provided that exceptional circumstances existed allowing continuance of the 18-month hearing from April 2013 to May 2013. Moreover, an additional six months of services—from May 2013 to November 2013—would be permitted upon the court finding that the parents had made significant progress in resolving the problems that led to the removal of the children and that there was a substantial probability the children would be returned to the home within the extended period of time. By agreement, family visitation was increased to four hours per week, with all of the children and parents attending together.

9

At a hearing on March 21, 2013, the juvenile court requested an updated mental health assessment for F.  It also authorized unsupervised and/or overnight visitation in the discretion of the Department.  In its addendum report for a hearing in May 2013, the Department indicated its intention to begin stepping down the supervision level during the family's weekly visits.  The juvenile court continued the 18-month hearing to August 2013 for further review of the parents' reunification efforts.

In a June 2013 report, the Department recommended a further step down in supervision as the visitation was going well.  In fact, Serena was reported to be ready for unsupervised visitation.  However, in its August 1, 2013, report, the Department noted some visitation issues involving F. and C.T.  Specifically, on July 7, father reportedly became angry at a McDonald's employee during a family visit, screaming, swearing and storming out of the building.  On July 28, C.T. and F.'s foster mother reported that neither girl wanted to attend the upcoming visit.  C.T. stated that her father had called her " 'crazy' " and she was worried he would yell " 'mean things in Chinese' " at her.  Based on these incidents, the Department recommended that visitation with the two younger girls remain supervised, and this was ordered by the court on August 28, 2013.  By October 2013, however, both C.T. and F. were experiencing anxiety after visits and conflicted loyalties after being told by father that they did not need to listen to their foster mother.

During this timeframe, Dr. Packer performed updated psychological evaluations on James, Billy, C.T., and F.  With respect to James and Billy, Dr. Packer concluded that—as a result of their 18 months of therapeutic placement—both boys had "progressed from a state of acute psychosis, to a level of functioning that offers a glimmer of hope that they can be brought along to function in society."  Severe social challenges remained their area of greatest concern, as the boys had failed to learn emotional reflection, emotional attunement, and empathy while growing up with their parents.  Dr. Packer recommended that the boys remain together in residential treatment, with hopes that they could ultimately be placed together in a therapeutic foster home.  She did not recommend return to mother and father.

10

Dr. Packer's evaluation of C.T. characterized the minor's academic progress since her removal from the family home as "remarkable," although she continued to be emotionally and socially delayed. While still diagnosed with PTSD, C.T.'s symptoms had reduced in intensity. However, C.T. still had fits and screamed when she did not get her way or was required to do a chore. And, she would act out by hitting F. or doing other things to make her younger sister cry. In Dr. Packer's opinion, C.T.'s "touchiness and her unruly, negativistic behaviors express her struggle and pushback about trusting adults to meet her dependency needs." Further, in order to "optimize her chances for healing from her severe emotional disorders," C.T. needed to be given a "clear message" that she would not be returning to her parents.

With respect to F., Dr. Packer again noted her characteristics of resilience and emotional strength. F. still showed issues with speech articulation that were not attributable to any underlying developmental delay. However, since her previous evaluation, she had become "remarkably more chatty and confident in expressing herself." Moreover, F. was no longer showing symptoms of PTSD. And, while she still presented with some attachment issues, such as indiscriminate friendliness, her behavior did not place her at the level of a "full-blown attachment disorder." Rather, Dr. Packer opined that she had the potential to form new attachments, although this possibility could lessen as she aged. Dr. Packer recommended that F. not be returned to her parents. In addition, while she acknowledged that F. was adoptable, Dr. Packer believed that keeping C.T. and F. together in the same placement would "reduce their risk factors going forward" and should therefore trump any solo move of F. to an adoptive home. According to Dr. Packer, such a joint placement "has the advantage of insulating them with the security of growing up with a sibling who understands their background and life experiences."

After numerous continuances, a contested 18 month review hearing was held over the course of five days in November 2013. In its third addendum report submitted in connection with this hearing, the Department noted that, with the necessary support and structure in their lives, James, Billy, C.T. and F. had been able to overcome many of the

11

"serious behavioral and emotional deficits" that they had originally displayed when they were removed from their parents' care. It stressed, however, the "high levels of neglect and trauma" that the children had experienced over the years. Further, the Department expressed concern that the parents had not progressed sufficiently to meet the minors' "extreme needs" and opined that return of the minors to their parents would likely result in a regression in the children's level of functioning. The Department thus recommended that reunification services be terminated for both parents.

At the conclusion of the contested hearing, the juvenile court agreed with the Department, terminated reunification services for mother and father, placed Billy, James and Serena in long-term foster care, and referred C.T. and F. for a permanency planning hearing pursuant to section 366.26. Both parents subsequently filed writ petitions with respect to C.T. and F., challenging the juvenile court's decision to terminate reunification services and refer the minors for permanency planning.[7] On February 27, 2014, we issued an unpublished opinion upholding the decision of the juvenile court, including its findings that the Department had provided reasonable services and that return to parental custody would present a substantial risk of detriment to the two minors. (*V.T. v. Superior Court* (Feb. 27, 2014, A140497 [nonpub. opn.].)

## C. *Permanency Planning*

In its report submitted in connection with the anticipated permanency planning hearing for C.T. and F., the Agency disclosed that C.T. had been removed from her foster placement with F. in December 2013, after being detained as a danger to herself pursuant to section 5150. Specifically, on December 3, C.T. reportedly attempted to get off her school bus while it was still moving. Later, when she arrived at her foster home, she initially refused to exit. Then, once she was off the bus, she attempted to go underneath it

---

[7] Appeals by mother and/or father of the juvenile court's decision to place Serena, James, and Billy in long term foster care were dismissed in July 2014 after counsel for both parents filed briefs finding no arguable issues. (*San Mateo County Human Services Agency v. K.L.* (July 3, 2014, A140377) [dismissal order].) By that point, Serena had turned 18.

while it was driving away. She subsequently tried to cut herself on a metal fence. The police were called and placed C.T. on a psychiatric hold. When the minor was released on December 9, she refused to return to her foster home and was therefore placed with another family.[8] F. and C.T., however, maintained contact during family visitation and also attended therapy with their parents every two weeks.

C.T. continued to take psychotropic medication to address her mood disorder and to participate in individual therapy to address her behavioral and emotional issues. She remained a special education student with an active IEP, but was mainstreamed in two subjects and doing well. Moreover, C.T. reported that she was enjoying school and making new friends since she had been moved. Because of her behavioral and emotional issues, the Agency was continuing to assess her adoptability.

F. reported that she enjoyed attending school and, according to her foster mother, she was doing well there. F. participated in weekly therapy, and her January 2014 treatment plan had indicated that she met the diagnostic criteria for adjustment disorder with mixed anxiety and depressed mood. Recently, however, F.'s behavioral symptoms, such as tantrums, had decreased. Her adoption worker opined that F. was adoptable, due to her age, good health, and ability to attach to her current caregiver. However, because of the "close sibling bond" between C.T. and F., the Department was requesting a bonding study and planned to assess how the children transitioned to living apart.

While C.T. and F. were still living together, the foster mother indicated that both girls displayed behavioral issues after family visits, including fighting and failing to follow the rules of the home. Reportedly, F. got more attention from father at family visits than did C.T., and C.T.'s therapist believed this could be a trigger for C.T.'s destructive behaviors. For instance, there appeared to be more physical aggressiveness by C.T. to F. after visits. F., however, was also showing some aggressiveness, becoming physically violent with other children and animals. At a visit on December 8, 2013, F.

---

[8] When asked about her refusal to go back to her foster home, C.T. merely stated that she did not want to return and that the foster mother sometimes used a loud voice when C.T. was not behaving.

told father that C.T. (who had been psychiatrically hospitalized) was lying about being sick and that she did not want to talk about her. Later, F. reported that C.T. always said that she (F.) lies, which is not true. Based on these and other issues with visitation, the juvenile court on January 17, 2014, decreased family visits from weekly to every other week pending the next court hearing.

On March 4, 2014—the date initially set for the permanency planning hearing—the juvenile court continued the matter so that a bonding study could be completed by Dr. Packer. The court indicated that the bonding study should consider all four children, even if not legally required to do so, because "it's more information that might make the picture clearer" and "it would be helpful to know as much as possible." The court also confirmed its reduction of supervised visitation between the children and their parents to twice per month, while supervised visitation among the siblings, themselves, was maintained at once per week. Finally, the juvenile court granted the petition for de facto parent status presented by F.'s foster mother, and appointed an attorney for her.

On June 9, 2014, Billy's attorney filed a section 388 petition asking the juvenile court to recognize his sibling relationship with F., arguing that the sibling exception to adoption should apply in this case, and maintaining that continued contact with all three of her siblings was in F.'s best interests. In addition, prior to the contested permanency planning hearing, the Department filed an addendum report which reiterated its previous conclusion that F. was adoptable. Indeed, F. was reported to be thriving in the home of her foster mother and had stated that she wanted to continue to live with her. Although F. was attached to the foster mother, the Department opined that, if the foster mother was for some unforeseen reason unable to proceed with permanency, it was "confident" that another adoptive home could be located for F. With respect to C.T., the Department was now recommending a permanent plan of long-term foster care due to her ongoing behavioral and emotional issues.

Finally, Dr. Packer submitted her bonding study, which concluded that, while the severance of her sibling relationships would be "impactful" for F., the relationship between the siblings did "not override the benefit to F. that adoption would provide." Dr.

14

Packer further indicated that F. was at "the final window of opportunity for being open to forming secure bonds with new parent figures. If she were to be freed for adoption, it is still probable that she could form healthy attachments with adoptive parents." Moreover, F.'s "recovery and resilience" boded well for her ability to adjust in a "nurturing and reparative adoptive placement."

In reaching her conclusions, Dr. Packer noted that all four siblings have a "double loading of risk factors" due to both their mother's mental illness and their history of neglect. While having improved significantly since their removal from the family home, James and Billy still struggled with "major issues in their mental functioning" and were in continued need of residential placement. C.T. was reported to be "consistent and firm" and "not at all sentimental" about living apart from F. Moreover, her jealousy of F.'s favored status was "still a dynamic" in the sibling relationship. With respect to F., while she "still display[ed] mild signs of attachment disorder, such as indiscriminate friendliness with strangers," she had for the most part overcome the symptoms Dr. Packer observed during prior evaluations. She was noted not to "reliably discriminate which brother is James and which is Billy." And, although her sibling attachment to C.T. was described as a "factor that needs to be considered," Dr. Packer opined: "As far as their relationship being a sustaining source of security, however, this was not found to be the case."

At the contested permanency planning hearing on June 10 and 12, 2014, F.'s adoption worker reiterated that he was "firm" that the minor was "very adoptable."[9] He further reported that, at his most recent home visit with F., she indicated that she wanted to remain with her current foster mother. Moreover, "[s]he was calm and pleased and joyful and we were playing with dolls, we played with dolls for awhile in a more calmer [sic] way than I have seen the other times. . . ." Although he acknowledged the bond between F. and C.T., the adoption worker testified that maintaining the sibling

_____

[9] C.T. was not present at this hearing as she had a "mental breakdown" at the conclusion of the prior hearing which resulted in a psychiatric hold pursuant to section 5150.

15

relationship was no longer the "first priority" after C.T.'s emotional issues caused several placement disruptions. Instead, permanency for F. became the higher priority.

Dr. Packer also testified at the contested hearing regarding F.'s sibling relationships. While she acknowledged that F. may long for her siblings in the future if she is not with them, that her siblings would create a sense of where she came from for F., and that F. would be "stunned" by losing her siblings, Dr. Packer reiterated her conclusion that permanent adoption offered F. "much more," stating: "Her life is yet un[-]lived, she is five years old and she is still at a point of openness to form a parental bond and that's the foundation of a healthy personality." Indeed, after C.T.'s second psychiatric breakdown, Dr. Packer no longer saw her relationship with F. as a healthy one. Rather, C.T. was unlikely to experience placement stability and was headed for "risk factors" as she aged due to "her desire for attention and her lack of foundation in knowing what[] to count on from adults and other people."

With respect to F.'s level of attachment to her siblings generally, Dr. Packer testified: "[F.] is a needy little girl and she has a history of attachment disorder. The main symptom was being indiscriminately friendly with strangers. She used to go up and seek affection from anyone. She is very adorable and she knows how to charm and get attention. And so the fact that she does that with her siblings but I also know that she does it with strangers doesn't convince me of the depth what she is doing with her siblings." Dr. Packer further testified that, while F.'s attachment issues might initially be exacerbated by termination of her sibling relationships, this setback would "presumably" be "offset by the richness of the new family she is placed with and moving onto a happy life." In sum, in her 40 years of experience with these types of cases, Dr. Packer had "seen so much better outcomes with adoption."

At the conclusion of the permanency planning hearing, the juvenile court acknowledged that there are "undeniable benefits" to sibling relationships and maintaining the family unit as much as possible. However, the court agreed with Dr. Packer that—in this case—any detriment suffered by F. from termination of her sibling relationships was outweighed by the likely benefits of adoption. In reaching its

16

conclusion, the court noted that fostering F.'s connection to the past through her siblings was not necessarily a good thing, as it had been a neglectful and abusive past. Characterizing the siblings' background as "just unfortunate," the juvenile court concluded that "they each need to have a chance to get passed [*sic*] it and not to relive it." In sum, the court opined: "Nothing about this case is ideal but I think I'm strongly convinced that this is the best option for F. That it gives her a much better chance [of] coming out well in the long run even if there are some additional bumps along the way from the presumed lack of connection with the siblings." Indeed, in the court's mind, the facts of the case did not even present a particularly close question. The juvenile court thus found F. adoptable, declined to apply the sibling exception to adoption, and terminated the parental rights of both mother and father. Timely notices of appeal by the parents brought the matter before this court for a second time.

## II. DISCUSSION

### A. *Standing and Standard of Review*

It is clear that—as parents whose parental rights would otherwise be terminated—both V.T. and K.L. have standing on appeal to challenge the juvenile court's refusal to apply the sibling exception to adoption in this case. (*In re Hector A.* (2005) 125 Cal.App.4th 783, 791; *In re L. Y. L.* (2002) 101 Cal.App.4th 942, 948-951 (*L. Y. L.*).) What is less clear is the appropriate standard of review to be applied by this court to the juvenile court's decision with respect to the applicability of the sibling exception. Initially, courts routinely reviewed such determinations for substantial evidence. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575-576 (*Autumn H.*); see *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 (*Jasmine D.*) [listing cases].) However, in 2000, the First District applied the abuse of discretion standard when reviewing the appropriateness of a juvenile court's refusal to apply one of the statutory exceptions to adoption. (*Jasmine D*, *supra*, 78 Cal.App.4th at p. 1351.) While acknowledging that the "practical differences" between the two standards of review are not "significant," the *Jasmine D.* court found the abuse of discretion standard to be analytically superior because custody determinations are typically reviewed on that basis. (*Ibid.*)

17

More recently, the Sixth District in *In re Bailey J.* (2010) 189 Cal.App.4th 1308, concluded that "both standards of review come into play in evaluating a challenge to a juvenile court's determination as to whether the parental or sibling relationship exception to adoption applies in a particular case." (*Id.* at p. 1314.) Specifically, the *Bailey J.* court determined that the first question—whether a beneficial parental or sibling relationship exists—is a factual one that should be reviewed for substantial evidence. (*Ibid.*) In contrast, the second question—whether the existence of that relationship constitutes a "compelling reason for determining that termination would be detrimental to the child"— was characterized by the *Bailey J.* court as a " 'quintessentially' discretionary" determination. (§ 366.26, subd. (c)(1)(B); *Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315.) Thus, this second question, which "calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption," should be reviewed for abuse of discretion. (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315.)

Since its publication, both the Second District and the Fourth District have adopted *Bailey J.*'s analysis regarding the proper standard of review in these cases. (*In re J.C.* (2014) 226 Cal.App.4th 503, 530-531 [Fourth Dist.]; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 [Second Dist.].) Like these courts, we find the *Bailey J.* approach persuasive and apply its hybrid standard of review here. In this regard, however, we note that the juvenile court in this case assumed the existence of beneficial sibling relationships, but concluded that any detriment suffered by F. from the termination of those relationships was outweighed by the likely benefits of adoption. Although the Department argues on appeal that F.'s sibling relationships were factually insufficient to invoke the sibling exception, we, like the juvenile court below, decline to reach that issue.

Rather, our focus is on whether the juvenile court abused its discretion in concluding that the benefits of adoption for F. outweighed any detriment caused by severing her relationships with her siblings. Under such circumstances, the question for

18

the reviewing court is whether the juvenile court's application of the law to the facts was arbitrary or capricious.  (*In re C.B.* (2010) 190 Cal.App.4th 102, 123.)  Moreover, the abuse of discretion standard recognizes that the juvenile court's "opportunity to observe the witnesses and generally get 'the feel of the case' warrants a high degree of appellate court deference."  (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351.)

**B.      *Sibling Relationship Exception***

At a permanency planning hearing, the juvenile court is charged with determining the most appropriate permanent plan of out-of-home care for a dependent child that has been unable to reunify.  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.)  As the most permanent of the available options, adoption is the plan preferred by the Legislature.  (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 573; see § 366.26, subd. (c)(1).)  Thus, if a court finds that a child is likely to be adopted if parental rights are terminated, it *must* select adoption as the permanent plan unless it finds a "compelling reason for determining that termination would be detrimental to the child" due to one or more of the " '*exceptional circumstances*' " specified by statute.  (§ 366.26, subd. (c)(1)(B); *In re A.A.* (2008) 167 Cal.App.4th 1292, 1320 (*A.A.*).)

A single statutory exception is implicated in the present case—where termination of parental rights would be detrimental to the child because "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption."  (§ 366.26, subd. (c)(1)(B)(v).)  The party attempting to establish the existence of the exception bears the burden of proof.  (*In re Megan S.* (2002) 104 Cal.App.4th 247, 251.)  Moreover, this burden is a heavy one.  In fact, the California Supreme Court has described the unusual circumstances which must be present before the sibling exception may be invoked as follows:  "Reflecting the Legislature's preference for adoption when possible, the 'sibling

19

relationship exception contains strong language creating a heavy burden for the party opposing adoption.  It only applies when the juvenile court determines that there is a "compelling reason" for concluding that the termination of parental rights would be "detrimental" to the child due to "substantial interference" with a sibling relationship.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 61 (*Celine R.*).)  Indeed, even the author of the legislation which added the sibling exception was of the opinion that a "child's relationship with his or her siblings would rarely be sufficiently strong to outweigh the benefits of adoption." (*L. Y. L.*, *supra*, 101 Cal.App.4th at p. 950.)

In the seminal case of *L. Y. L.*, *supra*, 101 Cal.App.4th 942, the court laid out guidelines for evaluating a claim that the sibling exception should be applied.  Specifically, the *L. Y. L.* court concluded that the Legislature intended courts analyzing the sibling exception to "balance the benefit of the child's relationship with his or her siblings against the benefit to the child of gaining a permanent home by adoption." (*L. Y. L.*, *supra*, 101 Cal.App.4th at p. 951.)  In particular, "[t]he court must balance the beneficial interest of the child in maintaining the sibling relationship, which might leave the child in a tenuous guardianship or foster home placement, against the sense of security and belonging adoption and a new home would confer." (*Ibid.*)

The *L. Y. L.* court went on to propose that—when determining the applicability of the sibling exception—a court should first "determine whether terminating parental rights would substantially interfere with the sibling relationship by evaluating the nature and extent of the relationship." (*Id.* at pp. 951-952.)  This is essentially a determination of significance.  As the court explained it:  "To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child.  [Fn. omitted.] Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended.  If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship." (*Id.* at p. 952.)  If a court finds an existing sibling relationship to be so significant that its severance would cause detriment to the minor, the court must then go on to balance competing interests.

20

Specifically, the court must then weigh "the benefit to the child of continuing the sibling relationship against the benefit to the child adoption would provide." (*Id.* at pp. 952-953.)

As stated above, we will assume for purposes of our decision that F.'s relationship with her siblings was significant enough that its severance would cause her to suffer some detriment. Although she was quite young (two years and nine months) when she was removed from her parents' home, she visited with Billy and James on a regular basis throughout these dependency proceedings and she lived with C.T. in foster care for an additional two years before C.T. chose to be placed elsewhere. Further, even after C.T. no longer lived with her, F. saw her regularly during sibling visitation and family therapy. Moreover, the record contains evidence of some level of bond between F. and her siblings. And, without making a determination as to its significance, the juvenile court did find that "there may be some love that exists between F. and her siblings" and that F. could "suffer some initial regression" if her relationships with her siblings were severed. The juvenile court, however, concluded that the likely benefits of adoption in F.'s case outweighed any benefit to the minor from continuing her sibling relationships. In reaching this conclusion, the court relied on Dr. Packer's evaluation and further noted that, given the "unfortunate" history of these siblings, fostering connections to their abusive and neglectful past might not be in F.'s best interest.

Both parents argue vigorously that the juvenile court erred in weighing the competing interests in this case. Specifically, they marshal the evidence in the record tending to support the existence of F.'s significant and beneficial relationships with her siblings and further contend that Dr. Packer's analysis of the situation was legally flawed in numerous respects. However, even if F.'s sibling relationships were significant, it is not all clear—as both the juvenile court and Dr. Packer expressed—that she would necessarily benefit by their continuance, either in an absolute sense or as compared to the permanence that she could achieve through adoption. Moreover, as we discuss in detail below, the parents' attempts to undercut Dr. Packer's expert opinion are all unavailing.

21

First, citing *Celine R.*, mother and father claim that Dr. Packer improperly focused on C.T.'s lack of attachment to F. when she should have concentrated on the impact of the sibling relationship on F., who knew C.T. as her sister and loved her. It is true that, pursuant to *Celine R.*, a court analyzing the applicability of the sibling exception must consider possible detriment *to the child being adopted* rather than any detriment to a sibling. (*Celine R.*, *supra*, 31 Cal.4th at p. 54.) This does not mean, however, that C.T.'s negative attitudes towards F., her desire to live apart from her younger sibling, and her general psychological instability were not all highly relevant to the juvenile court's detriment analysis. Indeed, the *Celine R.* court acknowledges as much, stating: "The sibling's relationship with the child [to be adopted] is not irrelevant. Certainly, evidence of the sibling's relationship with the child and, if the sibling is articulate, perhaps of the sibling's views of that relationship, might be relevant as indirect evidence of the effect the adoption may have on the adoptive child." (*Id.* at p. 55.) Here, C.T.'s situation and attitude constituted strong indirect evidence that—regardless of F.'s feelings about her sister—maintenance of the sibling relationship was not necessarily in F.'s best interests, including her long-term emotional interests, as compared to the stability of adoption. (See § 366.26, subd. (c)(1)(B)(v).) As Dr. Packer put it—despite F.'s sibling attachment to C.T.—their relationship was simply not found to be "a sustaining source of security" for the otherwise adoptable minor.

In addition, the parents argue that Dr. Packer based her changed opinion on the fact that C.T. and F. were no longer living together when, pursuant to *In re Valerie A.* (2007) 152 Cal.App.4th 987 (*Valerie A.*), this factor should not be deemed dispositive. *Valerie A.* does state that—when determining the nature and extent of the sibling relationship—the current situation of the siblings does not necessarily control. (*Id.* at pp. 1007-1010 ["when circumstances prevent a child from living with siblings or having regular sibling contact and visitation, the juvenile court may look to the past to determine the nature and extent of the sibling relationship"].) However, to establish the sibling exception to adoption, a parent must also show that, on balance, "continued sibling contact may be of greater *long-term* emotional interest to the child than adoption." (*Id.* at

22

p. 1010, fn. omitted.) Certainly, when weighing the sibling relationship against the benefits of adoption, the current living situation of the siblings is a relevant consideration. Here, Dr. Packer properly distinguished between two very different sets of circumstances. In the past, the minors were placed together and would grow up with daily sibling interaction, the long-term emotional impact of which might trump the permanence of adoption. Currently, however, the siblings, pursuant to their own wishes, remained in separate placements. Since—as the parents themselves argue and the juvenile court properly acknowledged—post-adoption contact among siblings cannot be presumed, this change in placement clearly altered the balance when weighing the maintenance of the sibling relationship against the permanency of adoption and was properly considered both by Dr. Packer and the court.

Next, the parents complain that Dr. Packer failed to consider guardianship with F.'s current caretaker as an option. This argument, however, ignores the statutory preference for adoption. Where, as here, a child is adoptable and the sibling relationship is deemed insufficient to establish the sibling exception to adoption, the availability of a possible guardianship is simply irrelevant. Indeed, Dr. Packer spoke to this point when she testified that—in her 40 years of experience with these types of cases—she had "seen so much better outcomes with adoption." As she elaborated: "[Adopted] children are not different from their peers, they are just kids with the last name of their parents. And in guardianship, kids have to explain themselves. So I think the probability of a positive outcome, if you have the choice of guardianship versus adoption, it's a much more likely good outcome with adoption."

The parents also assert that the benefits of adoption that Dr. Packer assumed F. would enjoy were speculative because there was no guarantee that F. would be adopted by her current foster mother to whom she was very attached. While, of course, nothing is certain, F.'s adoption social worker opined that she was "very" adoptable, either by her current caretaker or in a new adoptive placement. And, in Dr. Packer's opinion, F. remained able to form healthy attachments with adoptive parents and the minor's "recovery and resilience" boded well for how she would adjust if moved to a new

23

adoptive home. Thus, the minor was generally adoptable and therefore likely to enjoy the benefits of adoption, either in her current prospective adoptive home or in another placement. Indeed, as father, himself, points out, "the court's focus at a section 366.26 hearing is not upon who will adopt a dependent child but rather whether the child is likely to be adopted if rights are terminated." (See *A.A., supra,* 167 Cal.App.4th at p. 1325.)

Finally, the parents assert that—once Dr. Packer recognized that F. would suffer detriment from terminating her sibling relationships—the fact that she could likely resolve those issues over time in a nurturing adoptive home, even if true, did not mean that she would not be "greatly harmed" by termination of parental rights. (See *In re S.B.* (2008) 164 Cal.App.4th 289, 296-301 (*S.B.*) [concluding that the minor would be greatly harmed by the loss of her "significant, positive, emotional relationship with her father" (fn. omitted) despite the fact that she had a similar relationship with the grandmother with whom she was placed and regardless of whether the minor's loss might be "healed by time and support"].) We agree with *S.B.* that the potential for future resolution of the harm caused by termination of a protected relationship does not negate that harm for purposes of establishing the significance of the relationship. However, we believe that even "great harm" may be outweighed in a particular instance by the benefits of a permanent, adoptive home. Indeed, as the juvenile court here acknowledged—and as is so often true in these cases—nothing about this situation is "ideal." Thus, F. will likely suffer detriment of some kind no matter which permanent plan is selected for her. Under such circumstances—and given the court's statutory mandate to weigh the benefits from continuing F.'s sibling relationships against the benefits of adoption—we believe it was proper to consider the depth and pervasiveness of any detriment caused by the severing of those relationships when assessing the relative merits of the two, admittedly imperfect, choices before the court. This would include an assessment of the potential for that detriment to be ameliorated over time.

In sum, the court's reliance on Dr. Packer's expert opinion in this case was not misplaced. Further, Dr. Packer's opinion—in conjunction with the substantial evidence in the record tending to undercut the strength, quality, and supportive nature of F.'s

sibling relationships—amply supported the juvenile court's conclusion that any detriment suffered by F. from termination of her sibling relationships was outweighed by the benefits of adoption for this young minor. We see no error and certainly no abuse of discretion.

## III. DISPOSITION

The judgment is affirmed.

_____
REARDON, J.

We concur:


_____
RUVOLO, P. J.


_____
RIVERA, J.